Our second case is 24-4169 United States v. Allen. Mr. Cooley. Good morning. May it please the court. My name is Craig Cooley. I am CJA counsel for the appellant in this case, Ms. Carlisa Allen. In Ms. Allen's opening brief, I raised multiple sufficiency claims, particularly regarding counts 3, counts 4, counts 5, and the 841B1C sentencing enhancement that was attached to the sentence in count 1. The court doesn't have any progress as to which claim I plan to address. Counts 3, 4, and 5 first. Counts 3, 4, and 5 deal with the arrest of Ms. Allen and her co-defendant, Cy Frazier, on March 15, 2023. During the arrest, Mr. Frazier had a camouflage book bag, and Ms. Allen had a coach bag. And when the task force seized and searched Mr. Frazier's camouflage book bag, they seized $12,000 in cash, a digital scale, over 8 grams of cocaine, over 7 grams of fentanyl, and 70 oxycodone pills. In Ms. Allen's coach bag, they found two small baggies of cocaine, which I believe totaled cumulatively 1.16 grams. They found a straw. And in regards to count 5, they... Well, they also found a gun. Yes. And they found packaging in the console. They did find packaging in the center console. And that packaging was sort of unique. It was sort of their brand, the little packages, Ziploc bags, what, half-gram packaging? Yeah. I'll come out and say it, like I said in the brief, is that the government had them dead to rights for count 1. I mean, there's 22,000 pages of text messages, evidence that there was a conspiracy where Ms. Allen and Frazier were manufacturing cocaine, splicing it with fentanyl, and selling it to Duke and UNC students. I'm not going to argue that. So as to 3 and 4, my understanding is that your argument to be that your client didn't have sufficient control over the backpack, that the contents of the backpack shouldn't be counted. But what do you do with our discourse decision in Moody, where it talks about the driver of the vehicle having control of the vehicle and that that's sufficient to establish constructive possession of anything in the vehicle? This was her car. She was driving. I watched the dash cam video. There was, let's talk about each count. Again, count 3 focuses on the cocaine that was in Mr. Frazier's book bag, which was over 8 grams, which is a distribution amount of cocaine. Great. The coach bag had a small, much smaller amount, personal use amount, 1.16 grams. And the indictment for count 4 is the fentanyl. The only thing, the only packaging or the only thing that had the fentanyl was the camouflaged book bag. So the question is, was there fentanyl in her? No, no, your honor. But in this book backpack that you're calling a book bag, there are text messages, as I understand it, between the two that were in, these text messages were in evidence and they discuss putting the drugs in this backpack. And so it seems that both of the, both of them use the backpack. That I would, I would respectfully disagree. I don't think there's any photographic evidence. I believe she wrote 22,000 text messages. They put in what, 8,000 or 800 or whatever in evidence. And they cited as a, just a casual matter, a whole bunch of text messages where they talked about, he asked, where is this drug? And she says, well, you put it in the bag. And then he asked, and she put stuff in the bag, in the front pouch. And that bag was the conspiracies, the business. He talked about this business. Look, we have a wonderful business, albeit illegal. And the center inventory holder of that business was the bag. And the reason I asked you about the packaging is that bag didn't contain any packaging. When they seized it, it came in with distribution amounts of fentanyl and cocaine and scales, but he would still have to have the packaging. The packaging's in the console and the protection was under the seat in her car. There's, there was no, I don't think it's beyond any doubt that she knew that bag was the conspiracy bag that they had used over the whole time. She knew what was in it. She knew what was, where things were. He asked her, she says she put stuff in, he took stuff out, and he kept it at the barbershop, didn't he? I think there was evidence of that. He kept it with him, but it was in the place of residence. And so he gets in the car and he throws it in her lap. And there's no mystery about that bag. I would respectfully disagree. There is a mystery because if you look at how they charged and presented their conspiracy, they had students come in, they had testimony that, you know, they were meeting students on that day, particular day. Take count two. In count two, they charged Ms. Allen with- I know, but see, you're skipping a very important point, which is the centerpiece of your argument. Your centerpiece of your argument is what they discovered on the, at the arrest in the bag is not attributable to her. That's your argument. That's my argument. No, that's exactly- And my point is, if you look at the whole record, you see that that bag was not just uniquely his and he's carrying and there's a mystery when he threw it in there. That bag was the business bag and she was involved as deep as he was. She mixed, she put her on the scales. She told him what was in the bag, where it was. He would ask her about the bag and she would say, oh, you put that in the bag last night or this type of thing. And there's a bunch of those which are not being addressed. And I don't know why that, that bag was the center tool. It was the, it was the closet or the storage closet of the cabinet where they stored their stuff for their business and mutual- Everything you're saying is correct. And that all goes to count one though. You're talking about- No, it goes to count three because he's now charged with possession, constructive possession. It's in her car and she knows where it is. It was in her lap and then she put it in the driver's seat before they arrested her. He threw it in the car, but this was not just his private pack where he kept books or he kept his underwear or whatever you carry in book bags. I guess you're supposed to carry books in book bags, but this book bag was his drug distribution bag that both of them used. I would respectfully disagree on it. I don't think there's nothing in terms of with all the students who testified, particularly when Ms. Allen would make the delivery, there's no testimony that she ever had the book bag. It doesn't matter because at that point, she has arrangements to deliver certain packages and she's carrying those packages. And those packages are very small. They're like this. And on the day of the arrest, those packages were in the car. They were in the center console. And he carried the scales and he carried the drugs in gross amounts. And she carried two packagings in her purse that were cut already. And and she had the gun. Well, she legally owned the gun too. Well, it's not a question of whether she owned it or legally owned it. The question is whether she used it in connection with the distribution of drugs. There's also another component to this is that- Before you get to that, can I, I'm sorry to interrupt you, but even if you were to discount everything that Judge Niemeyer said about this long-term drug conspiracy, can I take you back to Judge Niemeyer? This is her car, right? So why wasn't the jury entitled to conclude that as whether she actually possessed the bag or constructively possessed the bag, owner of the car, she constructively possesses everything that's in that car? The bag, if you look at the fact, Adam, is the bag was in the car only to the extent that once Mr. Frazier saw the task force members approach him to make the arrest, he frantically tossed it to her. She placed it on the front seat. It wasn't in the- It wasn't in the car. They make, you have to visualize, you know, the task force members are, you know, after Mr. Zinner's death, you know, they sort of expedited their investigation. They scoped out the lion's den. They see Ms. Allen pull up to the lion's den. He was in the car with her. No, they were walking to the car. They were walking to the car when they got arrested. They saw, they walked to the car and- Well, I don't know. I think the record might show something else, but let's assume that he was in the car with the bag and tossed it to her and then gets arrested. If the bag is, in fact, in the car, doesn't our moody decision suggest that a jury could find that she constructively possessed that bag? Construction possession is about control and dominion. She didn't, again, I don't think there's anything, there's no evidence in the record that she ever, she might've known of the bag. There are text messages- She did not know of the bag. She had it in her lap. Because he threw it at her. I don't care what, she had it in her lap. That's the fact. And then she took it from her lap and put it in the car seat. Right? Constructive possession also has to be voluntary too. If I throw you something and you catch it- That's actual possession, actually. I mean, that's, but the government conceded, I mean, it got to the point of almost a concession that Mr. Fraser had the bag and he threw it at my client. So my question is, is that a voluntary action? If somebody throws something at me, am I just going to let it hit me? Is that a voluntary action? My argument would be involuntary. Well, you wouldn't be guilty of distribution if you didn't know what was in the bag. That was my second argument is how does, I get it, there is this green conspiracy, but the indictment is specific. It's on this day that they were going to distribute these drugs, March 15th, 2023. And the point, my global argument is this, is that the government is using their business relationship to impute knowledge, perpetual knowledge in a perpetual conspiracy. Anytime these two were ever together, count three and count four charge both of them, not a conspiracy, not actively and in aid of each other. Charge both of them with possession of cocaine and fentanyl, count four, of sufficient amount to violate the statute. On that day, both of them participated in, he had the inventory in the bag. The bag was taken from the car by the officers. She was in the driver's seat. She had the packaging in the console. She had the gun in underneath her seat. And the question, and we have all this background history for two years, they've been doing this. She's been mixing it. And here they are carrying out another act on the date of their arrest. Now, I don't know why both of them are actively participating in possession of those drugs for distribution. I mean, just because she was carrying the gun and he's carrying the bag, and then it ends up in her car, and that's where they find it. I'm saying there's nothing in the record that imputes, what knowledge do we have on that day that when she picked him up? Well, the dash cam video that I watched when they were arrested showed that they were, she was driving, he was a passenger. They were, police came from either side. The car was stopped. They were both, they both were one by one removed from the vehicle. And at that point, he threw the backpack back into the vehicle. So the backpack was in the car with the two of them while they were driving to wherever they were driving to. And the backpack was in a car that she owned and had possession over Dominion. She was driving, she owned the car. So it seems to me that. If you look at the totality of the evidence that day, and she was picking up Mr. Frazier. I thought you said he didn't get in the car. Well, she was, she went to the lion's den. I understand, but my question, was he in the car? Yes, he's in the car. I got that. And he's in the car. He's in the car for a very brief moment. And then, yes. And she's in the car. Yes. The driver sees the backpack in his lap, and they have the gun, and they have the packaging, and she has her purse. And they're together in the car, and they get arrested. And now, as he sees them coming, he flees, leaves the backpack behind, tosses it in the car, leaves the backpack on and runs. He throws his phone into the car. Throws the phone under the car and runs. Now, it seems to me. She didn't run. That's constructive possession. I would say, I mean, you could draw an inference that he ran. He knew it was in the book bag. Did she know? That's the whole argument. It's like, did she pick him up that day? You're falling back on whether she knew. And that goes to my point, is the bag was basically uniquely the storage closet. But I mean, is it what evidence? I mean, that's the point. Is there perpetual knowledge? Like, if I pick up my boyfriend. Perpetual knowledge is the fact that they constantly talk about the bag. Where is the stuff? Oh, it's in the bag. But is the bag always containing the stuff? If I have a backpack that I use. There's no evidence otherwise, because the numerous emails talk about drugs in the bags, drugs taken bags. Do you have these drugs? No, they're in the bag. You put them there last night. They're in your book bag. Your book bag. Well, yeah, but it's the book bag. It's his ownership, I gather. But that was used by the two of them. She put things in there. And he said, where is it? She says in the front pockets. And that, again, if you look at account two, or when any of the students testified as to when Ms. Fraser would deliver, there was no book bag, A. Because you don't deliver from the book bag. The book bag was the inventory. The scales, the gross amounts of fentanyl, the gross amounts of cocaine. So the question is, she carried two packagings in her purse, and she carried empty packaging in the console. But talking about her, the items in her purse are much different than what is in that book bag. Well, there's a strong argument that those two small baggies in the straw were for personal use. And if you read her pre-sentence report, she was using at the time she was arrested. She tested positive for fentanyl, cocaine, and marijuana. The jury didn't know that. I agree. That's a post-sentence. And the problem, Mr. Cooley, and obviously you're making the best argument you can for your client, is that those are great arguments. But why wasn't the jury entitled to reject them? And we're now on appeal. And the question is whether any reasonable juror could find for the government on the facts and the record. Well, again, in the light most favorable to the government, you have to give. So that's a real challenge. I'm simply saying, when you have a relationship where you're not only a jury, but you're also have an intimate relationship with them, is there a presumption that every time these two are together, they're together for a nefarious reason? Or are they together for a personal reason? I think for a personal reason, do you think he would have brought the book bag? If they were going out on a date. It's all speculation. I have not done speculation. It is because we know what was in the book bag. And we know that we know now. I'm saying to my client now, what evidence did the government present to show that she knew? In all the other cases, the witnesses testified, there is a trace. There's text messages that show that Ms. Allen is going to make this delivery. When you look at the text messages from March 13th for Ms. Allen in particular, she's talking about picking up her kid, taking him to school. He's in the back seat. Why would she bring her child to a drug deal when she's never done that? Why would she distribute drugs? I mean, there's a hierarchy of decision making here. I get it. I get it. There's a hierarchy. But that's the point is when she picked up Mr. Frazier that day, Caleb, her 15-year-old son was in the back. What, she was going to go pick him up and then they're going to go drop, make a deal with the kid in the back? That's one of the arguments. Is that sufficiency? The question is whether the jury could answer that and say they were. And the answer would be this. If it was just to pick up the child and he was riding along, he brings the inventory of the business along. She's carrying a gun. She's carrying packaging. She's got two samples in her purse that your argument is she could be using for personal use. But she was in the business of selling those little things. And so the jury can say, well, that trip wasn't just to pick up a son. That trip was for something else. I mean, they wouldn't have all that gear in there. I'm saying it's speculation as to what my client knew. And that was in that bag on that specific day. That's the primary argument. It's text mixing over years. But not on that day. There's no text message to say, hey, Si, I'm picking you up. You don't have to every day. That's 22,000 pages of text messages. They're pretty good at texting when there, in fact, is a drug deal taking place. Just coincidentally, on March 15, 2023, the government presented no text messages to say, or even strongly suggest that she was picking him up to go make a deal. That's it. So my argument is pure. I'm running short on time here. You're over time. Thank you, Mr. Cole. I'm going to stop you there. You've got some time for. Thank you. Thank you. Miss Williams-Durham, hear from you. Morning, your honors. Tracy Williams-Durham for the United States of America. Your honors, this court should affirm the district court's decision to deny the defendant's Rule 29 motions as there was substantial evidence for a reasonable juror to find the defendant guilty of counts three, four, and five. And likewise, excuse me, there was substantial evidence for a reasonable juror to find that the cocaine that was laced with fentanyl that Joshua Zinner purchased during the course of the conspiracy was the but-for cause of his death. And if I can just pick up where the argument ended regarding the drugs that were recovered from the book bag. All right. Can I actually ask you to address first the firearm count? Yeah. You know, in Lomax, this court held that mere possession of a firearm is insufficient to sustain a conviction. And here the district court did note that Alan legally possessed the firearm. I think a pretty high fraction of people in the state do own firearms. And there was evidence that she carried it all the time, that she had been reasoned for that. She had been the victim of a home invasion and said she carried the gun with her at all times. So why here is this not mere possession? What facts were presented to the jury that would reasonably allow them to conclude that it was used in connection with the drug offenses? Yes, Your Honor. Well, while it's true she did legally purchase the firearm at the time that she purchased it, at the time of her arrest, she was using it illegally. And I think... How do we know that? Well, the fact that she was found with the firearm that was loaded with an extended magazine with one in the chamber underneath her driver's side seat, where she also had two bags of cocaine in her purse, and she had her business partner, Cy Frazier, at her passenger seat, who was carrying a book bag that was full of drugs that was instrumental to their drug dealing business, demonstrates the fact that on that day she was using that firearm to further the drug trafficking conspiracy. And, Your Honors, there were several text messages between the two of them that was introduced in evidence in that 22,000-page thumb drive that was submitted back with the jury where they specifically discussed bringing firearms along with them during the course of their deals. For instance, on February 24th of 2023, the defendant texted Cy Frazier, bring the black one if you need something now, because I didn't bring purple. And purple is referring to a second gun that they possessed, which was the color purple. And they were... What was the date of those texts? That was from February 24th of 2023, Your Honor. But the question is whether or not they were, that Ms. Allen was using the gun in furtherance of the drug trafficking crimes alleged in Specifications 3 and 4, which occurred back in May. Yes, Your Honor. This is just providing some context that the jury was able to consider the fact that they did utilize a firearm when they were making their drug deals. What was the evidence that she was using the firearm in furtherance of their offenses that day? Well, Your Honor, the fact that she was carrying it while she was also in possession of significant amounts of drugs and cash. There was about $12,000 that was also recovered from Cy Frazier's book bag that day. What evidence is there that the gun played a role in the offense? I understand that she was carrying the gun. I understand that she possessed it legally. You pointed out that it was loaded, but that's not illegal as I understand it in the state. No, Your Honor, but I believe looking at the totality of the circumstances and the nature in which the gun was recovered, the fact that it was within close proximity to the drugs as well as to the proceeds of the drug sales that was in the book bag. And you did previously mention the Lomax case. And Your Honor, that case finds that a fact finder is certainly entitled to come to a common sense conclusion as to somebody being in possession of both drugs and a firearm on their person and the fact that the drug is most likely there to aid in the drug trafficking. And that's what was apparent here, Your Honor. It wasn't just that she was riding around with a firearm that she legally purchased and nothing else. She was riding around in the blue RAV4, which all of the students who testified that that was the mode of transportation for both her and for her business partner, Cy Frazier. So they were in that vehicle. And while they were in the vehicle, she was in possession of drugs. Her partner was in possession of drugs. There was packaging that was found in the center console. Clearly, the possession of the firearm that day was not merely for personal use. It was to further aid in their drug trafficking conspiracy. And Your Honor, even though there was the son in the back seat, which is something that counsel raised both in his brief and in his argument as. Yeah, let me ask. I'm sorry to interrupt you. But as I understand, counsel's argument is that, you know, even if the government had them debt to rights on the conspiracy, they were drug dealers. There's no question about that, that they're not drug dealers 24 7. And that sometimes this was a mom taking her son through apparently a PTA meeting. Does that recall? That's correct, Your Honor. You know, the jury would have in his view, the jury would have to speculate in order to find that on that day, they were actually engaged in their drug trafficking endeavors. Yes, Your Honor. And evidence was presented to the jury regarding the text messages between the defendant and Cy Frazier that day leading up to the arrest about what they were doing. But one of the things that the jury was also able to consider was the circumstances that led up to count two, which was the controlled purchase with one of the students, Matthew Warren. And if Your Honor's recall during that time, the defendant sold him approximately 21 bags. Again, the same small Ziploc bags of cocaine that she had in her purse and empty bags in the center console of her car that day. But Your Honor's, the jury was presented with testimony from TFO Wilking, who actually conducted surveillance on the date of the controlled purchase with Matthew Warren. And he observed the defendant arriving to her apartment complex in the blue ref for with a teenage son also in her vehicle. Presumably that was one of her children. They both get out of the vehicle, go into her apartment. Five minutes later, she immediately comes back out, gets into her car and goes straight to the deal with Matthew Warren. And Your Honor, of note from that particular incident, there was a photograph that was taken, which was submitted to the jury surveillance photo from that deal with Matthew Warren, which was count two of the indictment. But the purse that she is seen carrying is the exact same purse that she was found with the day of her arrest that also contained the two bags of cocaine. So Your Honor's, while she does have a personal life, while she may have been on her way to take her son to a PTA meeting or go to a PTA meeting for her son, that does not mean that afterwards she and her business partner, Cy Frazier, weren't going to go make a deal. And Your Honor, they were actually together the day before at the Lion's Den barbershop, which she and Cy Frazier texted multiple times about him housing drugs in the Lion's Den barbershop. But also students testified that sometimes when they would meet up with Frazier to purchase the drugs, they would meet him at the barbershop. So this was a place where both of them are aware has drugs or that they store their drugs sometimes while they're waiting to sell them. So on the date of her arrest, when she was in the vehicle with Cy Frazier, they both had drugs on them. Clearly, it might not have been at that point in time that they were intending to. Or even that day could be. The text messages from that day suggested they were going to attend an event at her son's school, and there was no evidence that shows that on that date they met to distribute drugs. Well, Your Honor, I think it was a reasonable inference for the jury to make based on all the evidence that was presented that they were together the day before at the Lion's Den barbershop. So it's reasonable to think that maybe they discussed in person their plans for what they were going to do the next day. And that's why there weren't any text messages. And Your Honor, I think it's interesting that there were 22,000 text messages. It seems like these two texted about everything. And then on this one day, there just happened to be no text messages about an upcoming drug deal when they really texted about their drug deals in the past. That's correct, Your Honor. But again, they were physically together the day before. There was surveillance that was taken at the Lion's Den barbershop of both of them together. So it's reasonable to assume that if they were physically together, they could have had a conversation with each other about what they were planning to do the following day. And Your Honors, they were actually physically together. Detective Camacho testified about the cast location of where Cy Frazier was before he delivered the lethal dosage to Joshua Zinner. And based on the cell phone data and the location data, their phones were actually at the same uh, they were hanging off of the same towers, which was Timber Hollow Apartments, which is where the defendant lived. So they were also together with each other before he went and sold to Joshua Zinner. I don't think there's any question that there was a drug conspiracy. I think the questions that are being raised are about the date of the arrest. Correct, Your Honor. I was just highlighting that as an example that if they are physically together, because there was no text messages about him selling to Joshua Zinner on that date with Carlisa Allen. So it's a reasonable inference for the jury to have made that if they are physically together leading prior to some sort of drug deal or some drug transaction, that there might not be text messages relating to that because they would have spoken to each other about it prior to actually making the deals. And, Your Honor, if we agree with your colleague about the backpack that Allen didn't constructively possess it, do you think there's enough, is there enough evidence for the jury to have convicted on the drug offenses without the backpack? Yes, Your Honor, because not only were there drugs that were recovered from the backpack, but there were also drugs that were recovered from her purse as well. And again, those drugs were packaged in their signature small white, black, and yellow one-by-one-inch Ziploc bags. Was there any fentanyl in that purse? There was no fentanyl, Your Honor. However, the lab analysts did detect the cutting agent, which she called PT-HIT, and I will call it that because I am unable to pronounce the actual name for the chemical products that it was. But PT-HIT was recovered or was indicated inside of the baggies that also contained cocaine. And that was also... Was the cocaine in those bags? Is that fentanyl? Was it cut with fentanyl, those two packages? There was no fentanyl that was detected in those two bags specifically. So it was cocaine and a cutting agent? That's correct, Your Honor. And didn't she test positive for both fentanyl and cocaine on the day of the arrest? Your Honor... And that suggests that she had these drugs on her possession for personal use? Well, I would highlight again that that evidence was not presented to the jury. That was provided in the pre-sentence report. However, I will note, Your Honor, that that is something that counsel referenced in his reply brief on page 11. However, he failed to include the next sentence from the pre-sentence report, which reads, the defendant admitted to use of marijuana but denied the use of cocaine and fentanyl. She further stated the marijuana she smoked prior to her being released to pre-trial supervision must have been laced with the illicit substances. And that's in the joint appendix at page 1087, Your Honor. So by her own admissions, she did not use cocaine or fentanyl. She only admitted to using marijuana. And if Your Honors don't have any further questions regarding counts three, four, and five, I'll turn briefly to the resulting death enhancement. Your Honors, again, there was substantial evidence that was presented to the jury for them to be able to determine that the cocaine that was purchased by Joshua Zinner did have fentanyl in it, and that the cocaine and fentanyl he ingested that night was his but-for cause of death. They heard testimony from the medical examiner, Dr. Heichel, who testified that she has been doing this for about 16 or so years and has performed several death certificates. And based on her evaluation of the death investigator's report, as well as the urine screen, the initial tox screen, and the full toxicology screen that came back, her determination for the cause of death was that it was accidental and that it was the result of a cocaine and fentanyl toxicity. She testified that both the cocaine and the fentanyl being illicit substances, once their introduction was made into the body at that point, it could not be ruled any sort of natural death and any other type of illnesses would kind of be secondary to the cocaine and fentanyl toxicity because the level of fentanyl that- They were levels that were lethal, right, both of them? That's correct, Your Honor. She did indicate that with cocaine, there's not a determinate amount that could be determined to be lethal, given that it is an illegal and illicit substance and serves no medical use. But she did say that with regards to fentanyl, because it can be used medically, the recommended dosage is about 3 nanograms per milliliter. The amount of fentanyl that was found in Joshua Zinner's bloodstream at the time of his death was 11 nanograms per milliliter, which she said is over three times the medically prescribed dosage, which is only when it's medically prescribed in a very controlled and safe environment. Here, in particular, Your Honor, she did indicate that the manner in which it was likely ingested by snorting through the nose would have then entered the bloodstream and therefore gone to the brain very quickly. And at that point, she ruled that the fentanyl and the cocaine both were the but-for cause of his death and were independently sufficient to cause his death. So with respect to that, there was no autopsy. This is a fairly young man, no indication of any health issues. But on the other hand, we don't know for sure, right, because there was no autopsy and don't know whether or not there might have been something else going on that might have potentially been a cause of his death. But as I understand your argument, that really doesn't matter because the ultimate conclusion is that this certainly, this combination of drugs, certainly would have caused his death. That's correct, Your Honor, and that's what Dr. Heichel testified to. She did explain that the Office of the Chief Medical Examiner did have to change their protocols in how they evaluated the death cases that were coming before them, given the COVID pandemic and the opioid epidemic, which was creating a substantial backlog for them. So as a result of that, they had to change their procedures. And what they did was do an initial screening where they had a death investigator go out to the scene and evaluate the scene and determine whether or not it was suspected that there was a drug overdose that caused the death. If that was correct, then they would do a urine sample and initial tox screen. If only marijuana came back as a positive, then they would move forward on an autopsy. But if there were other illicit substances, such as here, where there was high amounts of cocaine and fentanyl that were found in the system, then they can do a screening and leave an autopsy where the medical examiner still did a visual examination of the body. She reviewed the report that was provided by the death investigator. Did they find some? Didn't they find a packaging near his body? Yes, Your Honor. So at the time of the death, there were three Ziploc baggies that were, again, in that same one-by-one Ziploc-sized bag from the conspiracy. Two of them were empty, and one still had a little bit of matter in it, which was submitted to the laboratory and came back as positive for cocaine and fentanyl. It also found near the body was amoxicillin, and there was testimony from at least one expert, as I understand it, that the death could have been caused by an allergic reaction to amoxicillin. That's correct. There was a bottle of amoxicillin that was found on the bedside table. And amoxicillin was found in Zinner's blood as well, was it not? I'm not certain if it was found in his blood, Your Honor. I know that that was not something that Dr. Heichel considered to be a contributory cause of his death. The jury did— Did Dr. Heichel even consider the possibility that it could be an allergic reaction to an antibiotic that caused the death? Well, Your Honor, Dr. Heichel testified that if there was a positive test, that she would get notification of it because the full toxicology panel would test for numerous substances. She would not get all the ones that came out negative, but she would review the ones that came out positive, and she would evaluate all of that in making her determination. But I will say, Your Honor, that presented to the jury was testimony from Dr. Mears, who was Joshua Zinner's—his nephew, but—I'm sorry, his uncle, but he also was his pediatrician and worked at the practice that Josh attended for most of his young life. And during that time, he testified and medical records were introduced and evidence that he prescribed Josh with amoxicillin about half a dozen times, and over the course of those—those administrations, Josh never had any type of adverse reaction to the amoxicillin that he was prescribed. There was no sort of allergic reaction or any indication that he was allergic to the amoxicillin. And, Your Honors, even the defense's own expert testified that while he couldn't make a definitive determination as to what the cause of death was, there were three possibilities. The first was some sort of anaphylactic shock, which could be due to an allergic reaction to the amoxicillin. The second would be cocaine, and the third would be fentanyl. And because the jury was presented with sufficient evidence that Joshua Zinner did not have any allergies to amoxicillin, then that negates the defense expert witness's first theory, which was anaphylactic shock. Therefore, only leaving the two other theories, which are consistent with what Dr. Heichel testified was her ultimate determination as to the cause of death. And that's also consistent with all the other evidence that was presented during the course of the trial. All right. Thank you, counsel. Thank you, Your Honors. Mr. Cooley, you've got some rebuttal. Just a couple follow-up points. Based on the panel's questions to my colleague, I think the panel gets the gist of my argument, Ms. Allen's argument, that yes, there was a conspiracy. I'm not debating that. It's what were they on March 15, 2023? And again, even when viewed in light most favorable to the government, I still believe it's pure speculation as to whether Ms. Allen knew what was in that boat bag. Even if she knew that. Can I ask you in response to that argument, she was also charged with Section 2 violation, aiding and abetting. What's your response to that? In other words, that would not protect her from an aiding or abetting violation, would it? Lack of knowledge. Aiding and abetting. If she aided and abetted knowingly in other aspects of the distribution on that date, then she would be guilty as a principal, wouldn't she? It goes back to knowledge. I agree. If she knew what was in the book bag, then you'd get her on. I wouldn't be arguing. It works both ways. It all depends on what is her knowledge and what evidence is in the record to show that on March 15, 2023, that when she picked up Mr. Fraser, she knew that he had a tremendous amount of drugs, distribution amount, a digital scale, $12,000. It's pure speculation. Yes. Was he using the book bag? That's very specific. But the question is whether she knew that that was the drug carrying bag. And there was plenty of evidence for a jury to conclude that that bag was used over the period of time as the drug. It was referred to in their exchanges as the bag. In each case, it was referred to as where are the drugs? Which pocket? Do you have them? No, they're in the bag. Where did you put those? I put them in the front pockets. The bag apparently was a tool of the conspiracy. And while she may not have known specifically how much money was there, she knew it was the operational inventory carrier. But I agree. Under section two, though, and I believe I second to that as a question, because there is a section two. Yeah, there's a section two. And I cite a case of the Second Circuit that says the section two counts are really indictment specific. It's not about the account specific. It's count specific. And again, it goes back to the knowledge argument of when she went and picked up Mr. Fraser that day. What did she know? And moreover, when you talk about aiding and abetting, what affirmative action did she take to aid and abet him? She's driving him from there. It doesn't matter if they're coming together to do a drug deal. And she's the transportation and she's a source of packaging and she's a source of protection. Those are things the jury. Let's talk about the drug deal on March 15th. They came together on the 15th. You're, I'm assuming she didn't know what was in the bag, but she knew the bag was the device that they had used to store drugs. She had the drug baggies. She had some of her own drugs and which could have been earmarked for somebody who had already ordered them. And she had the loaded gun under the seat. The question is, and she provided the transportation. So the question is that aiding and abetting distribution? Only if you can show that there was in fact, a drug deal on March 15th, 2023, but that's indictment specific. It was possession with intent. On March 20th. Yeah, the day. And again, that I just keep going back to that specific date in the indictment. If they could have charged her with conspiracy on that day, they did. I mean, they charged her. They were going to distribute that on that date. And then when she picked him up, she had the intent to distribute whatever was in that. And I just don't see the evidence. They have a tremendous amount of evidence. Each and every, like, count to on March on February 23rd, when they made the control by the Matt Warren, a tremendous amount of evidence saying, you know, this is what's happening here. They're just, as your honor mentioned, there's simply nothing on that day. And this trove of text messages, if they're together, you don't text message when you're together, they're in a personal relationship. So the government's I understand. But on that day, they're together. They're engaged in an activity. He's in the car. She's in the car. And they're going somewhere. And they've got drugs. And the question is, they're not going to 15 year old son. And I would I question the government. The fact who was with Miss Allen on February 23rd is pure speculation. I can tell you right now, if it was her son, the government would have put that on the record and said, look, this is what she does. She brings her sons to these because we arrested her. Her son was in the back car. The drugs are here. Ergo, here's it's a distribution case. We don't know. There's no it's again, it's pure speculation who was in the car with her when she delivered made that delivery on February 23rd, 2023. But again, even in the light viewed most favorable to the government, I believe those three counts, which added 25 years to her sentence, she got 240 months for both counts, three and four, they're concurrent. And she got an additional 60 months for count five. And with that, I would ask that your court panel overturn those. Thank you, Mr. Thank you. I want to thank both counsel for their fine arguments. And Mr. Cooley, I want to specifically thank you for taking on this court appointed appeal. Needless to say, it's it's often challenging work. We obviously couldn't do what we do without lawyers who are willing to represent defendants on appeal. We've done that ably today. And we thank you. Well, the first time was it was was very well done. And Ms. Williams, they're on the same for you. Thank you for representing the interests of the United States and doing so ably. We're going to take a brief recess while the courtroom gets rearranged for the final argument, and then we'll come back and hear the third argument. We'll come down and recounsel and then take a recess.
judges: Albert Diaz, Paul V. Niemeyer, Nicole G. Berner